**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

ANDRE CANTEY,

                           Plaintiff,                     No. 9:17-CV-0284
                                                                   (LEK/CFH)

           v.

DANIEL F. MARTUSCELLO; CHAPLAIN
FATHER REDDIE; and DAVID
BARRINGER,

                           Defendants.

---

**APPEARANCES:**                                **OF COUNSEL:**

Andre Cantey
14-A-4643
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, New York 12788
Plaintiff pro se

Attorney General for the                    JOHN F. MOORE, ESQ.
  State of New York                      Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL
U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

     Plaintiff pro se Andre Cantey ("plaintiff"), an inmate who was, at all relevant times, in

---

    [1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

the custody of the New York Department of Corrections and Community Supervision ("DOCCS") brings this action pursuant to 42 U.S.C. § 1983, alleging that Superintendent ("Supt.") Daniel F. Martuscello, Staff Advisor/Chaplain Father Reddie, and Deputy Superintendent of Programs ("DSP") David Barringer – who, at all relevant times, were employed at Coxsackie Correctional Facility ("Coxsackie") – violated his constitutional rights under the First and Fourteenth Amendments. See Dkt. No. 1 ("Compl."). Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 33. Plaintiff opposed the motion, and defendants filed a reply. Dkt. Nos. 36, 37. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II.A.1. infra. Plaintiff is a practicing member of the Nation of Islam ("NOI"). Compl. at 5.

### 1. Saviour's Day

On October 6, 2015, while plaintiff and other NOI community members prepared for the religious observation of "Saviour's Day" scheduled for the following day, NOI staff advisor Father Reddie informed plaintiff and the rest of the community that the event had been

cancelled. Compl. at 5. Plaintiff filed grievance CX-18698-15 alleging that Father Reddie violated his First Amendment rights to religious freedoms. Id. at 5-6. As the NOI staff advisor, it was Father Reddie's obligation to secure the event space. Id. at 6. The Coxsackie grievance committee agreed with plaintiff, and acknowledged that Father Reddie "violated [his] religious right establishing irreparable harm as [Father] Reddie neglected to file the necessary paperwork to secure [p]laintiff's religious right." Id. at 6.

Plaintiff filed grievance CX-18862-16, dated March 3, 2016, alleging that Father Reddie and an unnamed corrections officer disturbed the NOI's Saviour's Day event,[2] and forced plaintiff and other community members to break their fast and terminate the event ahead of the scheduled time. Compl. at 8.


### 2. Jumu'ah Services[3]

While housed at Coxsackie, plaintiff wrote a letter dated June 23, 2015 to Father Reddie inquiring as to whether Jumu'ah services were offered, and "asked defendant Reddie's support to address this religious mandate to [DSP Barringer]." Compl. at 5. In November 2015, plaintiff received a memorandum from Supt. Martuscello that "denied [p]laintiff's religious right by referring to Ministerial Services Religious Calendar absent [Jumu'ah] Services for NOI, and [ ] referred to NOI adherents' sincerity to be better served in

---

[2] The undersigned believes that plaintiff is referring to a different Saviour's Day event than the October 2015 event previously mentioned.

[3] As defendants note, "Jumu'ah" is spelt "Jumu'ah," "Jummah," "Jumua'h," "Juma," and "Jumba" throughout the documents and declarations in the record. See Dkt. No. 33-7 at 8 n.2. The undersigned will use the spelling "Jumu'ah" when referring to the Muslim services.

the facility programs than daytime services in violation of [p]laintiff's religious right to [Jumu'ah] services on Friday afternoon." Id. at 6. Plaintiff contends that the Ministerial Services Religious Calendar does not recognize NOI services. Id. at 7.

Plaintiff sent a letter dated November 24, 2015 to Supt. Martuscello, DSP Barringer, and Father Reddie, informing them that Jumu'ah services were a "Muslim mandate for Friday afternoons" and that there is a difference between offering "services" and "classes." Compl. at 7.

Plaintiff filed grievance CX-18764-15, dated December 18, 2015, with regard to the cancelling of a Friday NOI service. Id. An investigation into that grievance revealed that NOI services had been incorrectly cancelled due to a miscommunication as to whether NOI services could be conducted by an inmate facilitator. Id.

Plaintiff filed grievance CX-18787-16, dated January 15, 2016, alleging that he and fellow NOI community members had been denied showers before NOI services, and that NOI service time had been reduced. Id. at 8. An investigation into that grievance demonstrated a 2012 memorandum drafted by Supt. Martuscello and non-party Deputy Superintendent of Security ("DSS") Christopher Miller had allowed showers, but that this memorandum had since been rescinded. Id. Supt. Martuscello supported the denial of NOI showers despite his 2012 memorandum, and refused to allow NOI services to be conducted absent Father Reddie. Id. at 8-9.

## B. Defendants' Recitation of the Facts

In support of this motion, defendants have filed a Statement of Material Facts.[4] Plaintiff identifies as an adherent of the NOI, an Islamic sect. Dkt. No. 33-6 ¶ 3. From 2012 through the first quarter of 2016, Father Reddie, a Protestant chaplain, was designated as the covering staff advisor for the NOI. Id. ¶ 7. In that role, Father Reddie assisted in facilitating the NOI religious services and classes that appeared on the ministerial services calendar, and addressed religious inquiries and concerns from the NOI community. Id. ¶ 8.

### 1. Saviour's Day, October 2015

The Saviour's Day Islamic religious holiday was scheduled for October 7, 2015 as a NOI special event on the 2015 Coxsackie Special Events Calendar. Dkt. No. 33-6 ¶ 16. On

---

[4] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

October 6, 2015, Father Reddie informed the NOI community that the Saviour's Day event needed to be rescheduled due to a lack of space at the facility. Id. ¶ 17. Father Reddie had previously conferred with DSP Barringer with regard to the large number of events scheduled for that date, and the subsequent lack of space. Id. ¶¶ 18, 19. DSP Barringer requested that Father Reddie ask the NOI community to reschedule the Saviour's Day event. Id. ¶ 20. The NOI community leaders had difficulties agreeing on a new date, in part due to Father Reddie's absence from the facility from October 12-15, 2015, but the inmate facilitators ultimately agreed to reschedule the event for another day. Id. ¶ 22. Plaintiff observed Father Reddie speaking with the NOI inmate facilitators, but did not know what was said. Id. ¶ 23. Prior to October 6, 2015, Father Reddie had filed the necessary paperwork for the Saviour's Day event. Id. ¶ 24. The Saviour's Day event was rescheduled and held on October 24, 2015. Id. ¶ 26.

On or about October 8, 2015, plaintiff filed a grievance (CX-18698-15) alleging that Father Reddie had "put off [the] [Saviour's] events for another day[ b]ecause he didn't have room for the events," and that Father Reddie had failed to submit the necessary paperwork to hold the event in accordance with DOCCS Directive 4022. Dkt. No. 33-6 ¶ 29 (internal quotation marks and citation omitted). Plaintiff requested that Father Reddie "follow Directive #4022 and Directive 4202." Id. ¶ 30 (internal quotation marks and citation omitted). During the investigation, Father Reddie authored a memorandum to DSP Barringer, stating that DSP Barringer instructed that he request that the NOI community reschedule their Saviour's Day event due to the lack of space in the facility for all of the events that had been scheduled. Id.

6

¶ 31.  Father Reddie further stated that although there were initially difficulties agreeing on a new date, the inmate facilitators did agree to reschedule the event for another day.  Id.  The Coxsackie Inmate Grievance Resolution Committee ("IGRC") accepted plaintiff's grievance "in majority," and recommended that Directive 4202, requiring that all groups be afforded designated accommodations, be adhered to by facility staff in any future deviations from observance of holy days. Id. ¶ 33.  The IGRC did not state that Father Reddie failed to submit the event paperwork.  Id. ¶ 34.

Although plaintiff agreed with the IGRC response, he filed an appeal with the Superintendent.  Dkt. No. 33-6 ¶ 35.  Non-party Acting Superintendent Lotz found that the grievance was accepted in part, and that "[a]lthough there [was] no evidence of any misconduct by staff, the facility does recognize that there was a deviation from the DOCCS religious calendar." Id. ¶ 38 (internal quotation marks and citation omitted). Plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC"), who therein "upheld the determination of the Superintendent for the reasons stated."  Id. ¶ 40 (internal quotation marks and citation omitted).  CORC noted that although the Division of Ministerial, Family and Volunteer Services was not contacted prior to the event being rescheduled, the event was held on the rescheduled date without incident.  Id.

## 2. Request for Jumu'ah Services

On or about June 23, 2015, plaintiff wrote a letter to Father Reddie requesting that he "inform the Deputy Superintendent to provide the Nation of Islam with Jumba [sic] services

7

during the Holy Month of Ramadan." Dkt. No. 33-6 ¶ 41 (internal quotation marks and citation omitted). According to plaintiff, in 2015, Ramadan lasted from June 18 through July 17. Id. ¶ 42. Plaintiff did not receive a response from Father Reddie, nor did he discuss the issue with him. Id. ¶ 43. Father Reddie did not receive the June 23, 2015 letter. Id. ¶ 44. Plaintiff next authored a letter requesting Jumu'ah services on November 7, 2015. Id. ¶ 47. Later that same month, plaintiff received a memorandum from Supt. Martuscello dated November 21, 2015, wherein he stated that the "Ministerial Services Religious Calendar made no accommodation for, or reference to, a Jumua'h [sic] Service for the N.O.I. religious Community." Id. ¶ 48. Supt. Martuscello further encouraged the NOI community to "make the best use of [their] existing program" during the daytime. Id.

Jumu'ah services were not listed on the Coxsackie Ministerial Services calendar from 2013 through 2015. Dkt. No. 33-6 ¶ 51. In addition to his letters requesting Jumu'ah services, plaintiff filed a grievance (CX-18704-15) in November 2015 requesting Friday Jumu'ah services. Id. ¶ 52. The grievance alleged that Father Reddie failed to provide NOI members with daytime religious services, while the Sunni Muslims and Christian religious groups were provided daytime services and religious study classes at night. Id. ¶ 53. Plaintiff requested that NOI members be provided with the same religious treatment as other religious groups by instituting a daytime service. Id. ¶ 54. Supt. Martuscello asked DSP Barringer to contact DOCCS Central Office to determine whether NOI could have their congregate services on Friday mornings. Id. ¶ 55. DSP Barringer requested NOI Jumu'ah Friday services by telephone call and email dated November 30, 2015. Id. ¶ 56. DOCCS Imam Mohommed S.

Ahmed responded to DSP Barringer's email, and stated that he had "contacted Director Morris and it [was] agreed that the NOI can have their congregate services on Friday mornings." Id. ¶ 57. Beginning January 8, 2016, NOI services were scheduled Friday mornings from 8:30 - 9:30 a.m. in the Coxsackie Chapel Annex. Id. ¶ 58.

The IGRC responded to grievance CX-18704-15 by accepting plaintiff's requested action, and informing plaintiff that the Central Office had approved his request for Friday morning congregate services beginning in January 2018. Dkt. No. 33-6 ¶ 59. Although Jumu'ah services were now available at the facility, plaintiff appealed the grievance to the Superintendent. Id. ¶ 61. Supt. Martuscello found "no undue discrimination against [plaintiff] by the facility, and no malfeasance by staff." Id. ¶ 62. He further stated that although there was no accommodation for the NOI faith to have a daytime service in the 2015 DOCCS religious calendar, that accommodation had been made for the 2016 calendar. Id. Plaintiff appealed the Superintendent's decision, and CORC found "insufficient evidence of discrimination or malice by staff." Id. ¶¶ 63, 64.

### 3. Cancellation of December 15, 2015 NOI Study Class

On December 15, 2015, the NOI religious class was cancelled by an unnamed Coxsackie corrections officer. Dkt. No. 33-6 ¶ 65. The unnamed corrections officer stated that he cancelled the class because the NOI staff advisor Father Reddie was not present. Id. ¶ 66. Father Reddie, DSP Barringer, and Supt. Martuscello were not present during this incident, and were not involved in the decision to cancel the class. Id. ¶¶ 67-69. Plaintiff filed

a consolidated grievance (CX-18764-15) alleging that the religious class was cancelled, and an inmate facilitator was not allowed to run the class in place of the staff advisor. Id. ¶ 71. Moreover, plaintiff alleged that NOI classes were always cancelled, and, without the implementation of a Friday religious service, they fail to receive weekly religious activities. Id. Plaintiff requested that the NOI community members receive the same equal treatment as the Sunni Muslims and Christian religious communities, and that future study classes are not cancelled. Id. ¶ 72.

The IGRC accepted the actions requested in plaintiff's grievance, and stated that staff had been informed that NOI services could be held without a coordinating chaplain. Dkt. No. 33-6 ¶ 73. Plaintiff appealed grievance CX-18764-15 to the Superintendent, and, on or about January 12, 2016, the Superintendent accepted in part plaintiff's grievance, noting that "[a]lthough there is no malfeasance found by any staff member, security staff has been notified [that NOI services are allowed to proceed without a staff advisor present, so long as an inmate facilitator is present], and the situation has been resolved." Id. ¶ 75. Plaintiff appealed the Superintendent's decision to CORC, and, on June 15, 2016, CORC accepted the action requested "only to the extent that CORC upholds the determination of the Superintendent for the reasons stated." Id. ¶ 77. Inmate facilitators conducted NOI study classes before and after the CORC decision, and the NOI study class was not cancelled again after December 15, 2015. Id. ¶¶ 78, 79.

10

#### 4. Showers before Jumu'ah Services

On January 8, 2016, during Jumu'ah services, an unnamed NOI community member requested that the community be allowed to take showers before Jumu'ah services. Dkt. No. 33-6 ¶ 80.  Father Reddie was not involved in the discussion regarding the request for showers before NOI services. Id. ¶ 81.  DSP Barringer informed the NOI members that inmates did not have the right to shower before religious services. Id. ¶ 82. On January 15, 2016, plaintiff filed a grievance (CX-18787-16) stating that DSP Barringer denied the NOI members request for showers prior to their services, despite a memorandum dated March 9, 2012 stating that the NOI are entitled to showers prior to services. Id. ¶¶ 83, 84.  Plaintiff requested showers prior to Jumu'ah services, and alluded that Sunni Muslims are allowed to shower before their services. Id. ¶ 84.  A March 9, 2012 memorandum from prior Coxsackie Deputy Superintendent of Security Miller allowed inmates attending NOI services to shower, but that memorandum was rescinded prior to January 8, 2016. Id. ¶ 85.  As of January 8, 2016, no inmate, regardless of religious group, was permitted to shower as a matter of right immediately prior to their religious service. Id. ¶ 86.

In response to the grievance investigation, DSP Barringer wrote a memorandum to the IGRC that advised that (1) Central Office Ministerial Services allowed for NOI services on Friday mornings; and (2) the March 9, 2012 memorandum from former DSS C. Miller that allowed inmates to shower before services had since been rescinded.  Dkt. No. 33-6 ¶ 87. DSP Barringer's memorandum also stated that the current facility policy did not provide for a right to showers before any religious services, and that the Central Office Ministerial

Services had supported this decision. Id. The IGRC denied plaintiff's grievance for the reasons stated in DSP Barringer's memorandum. Id. ¶ 88. The IGRC also addressed complaints as to why the classes were held Friday mornings as opposed to Friday afternoons, and why the class was only one hour long. Id. Plaintiff appealed the denial of his grievance to the Superintendent, and, on February 24, 2016, Supt. Martuscello found plaintiff's grievance without merit. Id. ¶¶ 89, 90. Plaintiff appealed the Superintendent's decision to CORC. Id. ¶ 91. On May 25, 2016, CORC upheld the determination of the Superintendent. Id. ¶ 92.

### 5. Insufficient Time for Religious Services

On February 18, 2016, plaintiff filed a grievance (CX-18836-16) alleging that the one hour time block the NOI received for religious services was insufficient. Dkt. No. 33-6 ¶¶ 93-94. Plaintiff noted that Christians and Sunni Muslims "never have this problem," and that the Ministerial Services calendar demonstrates that those religious groups have over two hours of religious service time. Id. ¶ 94 (internal quotation marks and citation omitted). Plaintiff requested that NOI receive "the same treatment as other the Religious groups and get sufficient amount of Religious service time like the other Religious group[s]." Id. Father Reddie and DSP Barringer did not make the determination regarding what time to make the announcement to let NOI members out of their cells to attend services. Id. ¶¶ 95-96. Supt. Martuscello first learned of plaintiff's complaint of insufficient time for religious services when he issued a determination on grievance CX-18836-16. Id. ¶ 97. In that determination, Supt. Martuscello found that plaintiff's complaint had "some merit," noting that "[d]ue to the fact that

the NOI Friday service is not being announced until 8:30, there is [a] chance that members are not present for their full hour of service." Id. ¶ 98 (internal quotation marks and citation omitted). Thus, Supt. Martuscello stated that the announcement for NOI call outs would be made at 8:15 a.m. to allow members to be present in the Chapel Annex for the fully allotted time. Id. Plaintiff appealed the Superintendent's determination to CORC, who accepted plaintiff's requested actions "only to the extent that CORC uph[e]ld the determination of the Superintendent for the reasons stated." Id. ¶ 101. At this time, plaintiff had transferred out of Coxsackie. Id. ¶ 100.

### 6. Saviour's Day, February 2016

On February 26, 2016, the NOI members held a Saviour's Day event at the Coxsackie Chapel Annex. Dkt. No. 33-6 ¶ 102. On March 3, 2016, plaintiff filed a grievance (CX-18862-16) alleging that corrections officers, accompanied by Father Reddie, forced the NOI members to end their event at 5:00 p.m. and break their fast before the sun went down. Id. ¶ 103. Plaintiff stated that non-party C.O. Casey issued the direct order to the NOI members to leave the Chapel and go to the mess hall. Id. ¶ 104. Plaintiff further stated that non-party Sgt. Donovan issued the direct order to eat before sunset. Id. ¶ 105. Supt. Martuscello was not present at the facility on February 26, 2016. Id. ¶ 106. DSP Barringer was not present at the facility on February 26, 2016. Id. ¶ 107. On April 28, 2016, Supt. Martuscello issued a determination on plaintiff's grievance, finding "no merit" to plaintiff's complaints. Id. ¶ 108 (internal quotation marks and citation omitted). Supt. Martuscello noted

that the religious event had been "held in accordance with the event packet, which was approved by Facility Administration," and that "[f]acility clergy and security staff have gone on the record denying allegations of misconduct toward the attendees of the religious function." Id. (internal quotation marks and citation omitted).

On May 4, 2016, plaintiff appealed the Superintendent's decision. Dkt. No. 33-6 ¶ 109. On September 14, 2016, CORC issued a decision upholding the determination of the Superintendent. Id. ¶ 110.

## II. Discussion[5]

### A. Legal Standards

### 1. Summary Judgment Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

---

[5] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id.  "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d

185, 191-92 (2d Cir. 2008).

## 2. N.D.N.Y. Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts. See N.D.N.Y.L.R. 7.1(a)(3). "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Id. The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Id. "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Id. (emphasis omitted).

Defendants argue that although plaintiff specifically admits to over half of the paragraphs in the Statement of Material Facts, "[a] large portion of the remaining response contains responsive paragraphs which contain no admission or denial whatsoever, but narrative responses where [p]laintiff provides factual argument related to the statement, which in may cases seem to disagree with the assertions of those paragraphs." Dkt. No. 37-1 ("Def. Reply") at 4-5. Defendants note that these paragraphs do not contain citations to the record to controvert the denial, and, thus, are not in compliance with Rule 7.1(a)(3) and should be admitted. Id. at 5. Defendants also argue that the paragraphs plaintiff does deny are not supported by citations to the record or other evidence, and should be admitted. Id.

The undersigned is not required to "perform an independent review of the record to find

proof of a factual dispute." Prestopnik v. Whelan, 253 F. Supp 2d 369, 371 (N.D.N.Y. 2003) (concluding that the "plaintiff's suggestion that the transcript and videotape of the [incident] be reviewed to identify support for her Statement of Material Facts Not in Dispute does not cure her failure to comply with Rule 7.1(a)(3).").  Although defendants argue, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert" with specific citations to the record, pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit. N.D.N.Y. L.R. 7.1(a)(3); Def. Reply at 4-5; see subsection II (A) supra.  Accordingly, in deference to plaintiff's pro se status, the Court will independently review the record when evaluating defendants' Motion for Summary Judgment, and "treat plaintiff's opposition as a response to" defendants' Statement of Material Facts. Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to Plaintiff as a pro se civil rights litigant, however, the Court will treat his opposition as a response to Defendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of Defendant's Rule 7.1 Statement."); see Perry v. Ogdensburg Corr. Facility, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016) (determining that "although [p]laintiff failed to respond to the statement of material facts filed by [d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective Motions for summary judgment.").

17

### B. First Amendment

In the May 11, 2017 Decision and Order, this Court found that plaintiff's First Amendment free exercise claim against Father Reddie survived initial review. Dkt. No. 5 at 7-9. "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).

> To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective.

Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives —including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted).

> The Turner Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987)).

"The governing standard is one of reasonableness, taking into account whether the

particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." Benjamin, 905 F.2d at 574  (citations omitted). The same analysis is undertaken when there is an allegation that "an individual dec[ided] to deny a prisoner the ability to engage in some requested religious practice." Ford, 352 F.3d at 595 n.15 (citations omitted).

It is the plaintiff's burden to establish that "the disputed conduct substantially burdens his sincerely held beliefs." Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006) (citing Ford, 352 F.3d at 591)).  However, in assessing whether a plaintiff's belief is sincerely held, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004) (quoting Hernandez v. Comm'r, 490 U.S. 680, 699 (1989)) (internal quotation marks omitted).  Once a plaintiff has demonstrated "that the disputed conduct substantially burdens his sincerely held religious beliefs," the burden shifts to the defendants to establish a legitimate penological purpose. Salahuddin, 467 F.3d at 274-75. If a legitimate penological purpose is identified, the Court must then assess its reasonableness under the Turner factors set forth above.

For the purposes of this motion, defendants do not question the sincerity of plaintiff's religious beliefs; instead, they argue that "[p]laintiff cannot show that Father Reddie's alleged failure to secure  [p]laintiff's right to Jumu'ah Services for NOI registered members or the rescheduling of the October 2015 Saviour's Day religious event was a substantial burden on his religion, or that defendant prevented plaintiff, in other ways, from practicing his religion."

Dkt. No. 33-7 ("Def. Mem of Law") at 10, 11.[6]

## 1. Jumu'ah Services

First, plaintiff contends that Father Reddie failed to provide the NOI members with Friday Jumu'ah services. See Compl. at 5, 6, 7.   "[P]risoners have a constitutional right to participate in congregate religious services." Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted). Although the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted). Neither party disputes that Friday Jumu'ah services were not listed on the 2015 Coxsackie Ministerial Services Religious Calendar as an approved religious service for the NOI. See Compl. at 5, 7; Def. Mem. of Law at 11; Dkt. No. 33-4 ("Reddie Decl.") ¶ 6, Ex. 3 at 17. Plaintiff contends that he first requested Jumu'ah services in a June 23, 2015 letter to Father Reddie. See Compl. at 5; Dkt. No. 33-2 at 224.  In that letter, plaintiff requested that Father Reddie "inform the Deputy Superintendent to provide the Nation of Islam Jumba [sic] Services

---

[6]"[I]t is unclear whether the 'substantial burden' element of this test remains viable," Davis v. Williams, No. 3:16-CV-1981 (JAM), 2017 WL 507213, at *2, n. 1 (D. Conn. Feb. 7, 2017), and the Second Circuit has expressed doubt whether a prisoner must make this threshold showing.  Holland v. Goord, 758 F.3d 215, 220 (2d Cir. 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.") (internal quotation marks omitted); see also Williams v. Does, 639 F. App'x 55, 56 (2d Cir. 2016) (summary order) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs.") (citing Holland, 758 F.3d at 220-21). Nevertheless, as both parties have addressed the substantial burden element in their briefs, the undersigned will apply it for purposes of this Motion.

during the Holy Month of Ramadan." Dkt. No. 33-2 at 125.  Father Reddie declared that he did not receive plaintiff's June 2015 request for Jumu'ah services, and first became aware of such request in October or November 2015 after plaintiff filed a grievance and wrote a subsequent letter to prison officials.  Reddie Decl. ¶ 6.  Plaintiff testified that he did not write any letters between June 2015 and October 2015 to Father Reddie or any other defendant requesting Jumu'ah services.  Dkt. No. 33-2 at 233.

Irrespective of when Father Reddie first learned of plaintiff's request for Jumu'ah services, summary judgment is warranted based upon the lack of any evidence that would permit a rational jury to conclude that Father Reddie was responsible or personally involved in the alleged unconstitutional conditions.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)).    The undersigned finds that the record is void of any evidence establishing that Father Reddie was responsible or in any way involved in denying plaintiff Jumu'ah services.  In fact, the record establishes the opposite.  In November 2015, after defendants became aware that plaintiff had filed a grievance requesting daytime Jumu'ah services for the NOI community, Supt. Martuscello instructed DSP Barringer to request that the DOCCS Central Office allow Coxsackie to hold NOI services on Friday mornings.  Dkt. No. 33-3 ("Barringer Decl.") ¶ 6, Ex. 5 at 82 (detailing DSP Barringer's email correspondence with DOCCS Central Office regarding Jumu'ah services); Dkt. No. 33-5 ("Martuscello Decl.") ¶ 21.  DOCCS Central Office Imam Ahmed Mohammad approved the request for NOI

congregate services, and an accommodation was made for the 2016 religious calendar.  Id.

Beginning January 8, 2016, NOI services were scheduled in the Coxsackie Chapel Annex on

Friday mornings from 8:30 - 9:30 a.m.  Id.  Plaintiff's allegations that Father Reddie "knew or

should have known by denying the N.O.I. religious service for the whole entire year of 2015

would pose a substantial burden on [him]" are conclusory, and he fails to proffer admissible

evidence suggesting that Father Reddie was personally involved in the alleged denial or

subsequent accommodation of Jumu'ah services.  Dkt. No. 36 ("Pl. Opp.") ¶ 14.  Thus, as

plaintiff has failed to demonstrate Father Reddie's personal involvement in the alleged denial

of Jumu'ah services, it is recommended that defendants' motion for summary judgment on this

ground be granted.


### 2. October 2015 Saviour's Day event

Plaintiff also contends that Father Reddie violated his "religious rights" by failing to file

the necessary paperwork to secure the event space for the October 7, 2015 Saviour's Day

event.  Compl. at 6.  Saviour's Day is an Islamic religious holiday that was scheduled as a NOI

special event on the 2015 Coxsackie Special Events Calendar.  Reddie Decl. ¶ 4, Ex. 1 at

11.  Father Reddie declared that prior to October 7, 2015, he informed DSP Barringer that

the facility lacked the space necessary for all events scheduled on October 7.  Id. ¶ 4.  DSP

Barringer requested that Father Reddie ask the NOI community to reschedule their Saviour's

Day event.  Id.  On October 6, 2015, Father Reddie met with the NOI community during their

weekly study class, and discussed the possibility of rescheduling the event. Id. Father Reddie

needed to be away from the facility from October 12 through October 15, 2015, and because of that absence, the NOI community had difficulty agreeing on a new date. Id. Ultimately, the NOI inmate facilitators did agree to have the event rescheduled for another day. Id. Saviour's Day was rescheduled for and held on October 24, 2015. Id.

As part of the investigation into plaintiff's grievance (CX-18698-15) regarding the rescheduling of the Saviour's Day event, Father Reddie drafted a memorandum to DSP Barringer, dated October 19, 2015, which stated:

> **Ministerial Services did not Den[y] the N.O.I. Community of Savior's [sic] Day Celebrations which was [sic] scheduled for October 7, 2015!**
>
> I, recognized that there would be clashes because of a total lack of space for all events which were scheduled for (10/7/15).  I conferred with DSP Barringer, informing him on the pending Challenges as they relate[d] to the space we have. He instructed that I request[ ] the Community to reschedule their Event.  The matter of re-scheduling was first brought to the attention of the inmate Facilitator and then, to all attendees at the evening class.
>
> They had difficulties agreeing on a new date especially, I had to be away from the Facility for the upcoming week: (12th - 16th 2015).  However, they did agree to have the Event re-scheduled for another day.

Reddie Decl. at Ex. 2 at 15 (emphasis in original).

Even though there is no bright-line rule as to "the frequency with which missing religious services . . . becomes a burden of constitutional significance, limits on an inmate's religious exercise which prevent attendance at . . . services once a week or less have routinely been held not to compromise a burden on religious exercise." Simmons v. Adamy, 987 F. Supp. 2d 302, 309 (W.D.N.Y. 2013); see Jean-Laurent v. Los, No. 12-CV-132S(F), 2015 WL

1015383, at *6 (W.D.N.Y. Mar. 9, 2015) ("Courts within the Second Circuit have consistently

held that missing two religious services does not pose a substantial burden on an inmate's

religion."); Shapiro v. Comm. First Serv. Inc., No. 11-CV-4061 (KAM)(LB), 2014 WL 1276479,

at *11 (E.D.N.Y. Mar. 27, 2014) ("[N]ot permitting a prisoner to attend two religious services

'is a de minimis, or insubstantial, burden on an inmate's ability to freely exercise his religion.'")

(quoting Smith v. Graziano, No. 08-CV-469, 2010 WL 1330019, at *9 (N.D.N.Y. Mar. 16,

2010)); Johnson v. Newton, No. 02-CV-1277, 2007 WL 778421, at *5 (N.D.N.Y. Mar. 13,

2007) ("Moreover, even assuming that [the defendant] prevented [the plaintiff] from entering

a mosque on September 8, his claim must fail because missing one religious service does

not constitute a substantial burden on an inmate's right to the free exercise of his religion.")

(internal quotation marks and citation omitted).  Plaintiff testified that prior to October 6, 2015,

the NOI community had not had problems scheduling holidays that affected him personally.

Dkt. No. 33-2 at 236.  Although the undersigned does not dispute plaintiff's contentions that

he "suffered a discouragement of faith [and] lost his sense of purpose and direction" due to

the rescheduling of the event, see Pl. Opp. ¶ 22, the record is clear that the rescheduling of

the October 7, 2015 religious service was an isolated occurrence, and there is no indication

that Father Reddie acted to deny plaintiff his ability to engage in the religious event, as it was

rescheduled for later that month.  See Ford, 352 F.3d at 595 n.15 (citations omitted).

Moreover, plaintiff fails to proffer admissible evidence substantiating his claims that (1)

Father Reddie failed to submit the necessary paperwork to secure the event space on

October 7, 2015; and (2) Saviour's Day was not rescheduled for October 24, 2015, and that

the Holy Day of Atonement occurred on that date.  See Compl. at 6; Pl. Opp. ¶¶ 16, 17, 21.

At his deposition, plaintiff testified that he did not have personal knowledge as to whether

Father Reddie timely submitted the necessary paperwork.  Dkt. No. 33-2 at 251; see Felix-

Torres v. Graham, 687 F. Supp. 2d 38, 51 (N.D.N.Y. 2009) (finding that a statement "wholly

devoid of facts based on personal knowledge . . . is insufficient to create a genuine issue of

material fact on a motion for summary judgment.").  Additionally, the grievance CX-18698-15

investigation established that the rescheduled Saviour's Day event occurred on October 24,

2015.  See id. at 86 ("CORC notes that the 10/7/15 NOI Holy Day event was rescheduled for

10/24/15 due to a lack of space at the facility . . . CORC further notes that the 10/17/15 event

was held that day with no incidents.").    "Plaintiff is required to proffer facts to defeat

defendants' motion for summary judgment, not merely rely upon conclusory statements." Aziz

Zarif Shabazz v. Pico, 994 F. Supp. 460, 468 (S.D.N.Y. 1998); see Angulo v. Nassau Cnty.,

89 F. Supp. 3d 541, 549 (E.D.N.Y. 2015) ("[I]t is insufficient for a party opposing summary

judgment merely to assert a conclusion without supplying supporting arguments or facts.")

(internal quotation marks and citation omitted).  Thus, as plaintiff fails to demonstrate that the

rescheduling of the Saviour's Day event constituted a substantial burden on his religious

beliefs, it is recommended that the defendants' motion on this ground be granted.


### 3. Plaintiff's Remaining Contentions

Plaintiff testified that his only claims against Father Reddie include his failure to provide

Jumu'ah services and the alleged cancellation of the October 2015 Saviour's Day event.  See

Dkt. No. 33-2 at 334.  However, to the extent that plaintiff's remaining allegations regarding the cancellation of a NOI class in December 2015; the alleged denial of showers prior to Jumu'ah services; call-out times for Jumu'ah services; and the February 2016 Saviour's Day event involve Father Reddie, the undersigned agrees with defendants that plaintiff has not demonstrated Father Reddie's personal involvement.  Father Reddie was not present at the facility on Tuesday, December 15, 2015 when an evening NOI class was cancelled, and he was not involved in the discussion regarding the NOI community's requested showers prior to Jumu'ah services.  Reddie Decl. ¶¶ 7, 8.  Father Reddie further declared that he "did not make the determination regarding what time to make the [call-out] announcement and let NOI adherents out of their cells in January 2016."  Id. ¶ 9.

Finally, as defendants note, although Father Reddie was present for the February 26, 2016 Savior's Day event, plaintiff testified that non-party corrections officers, Sgt. Donovan and C.O. Casey, gave plaintiff and the other NOI community members the order to go to the mess hall and eat.  See Dkt. No. 33-2 at 135-36, 142; Dkt. No. 37-1 ("Def. Reply") at 7. Father Reddie declared that at 5:00 p.m., he advised the NOI community that the meal was ready and instructed them to begin to prepare themselves to walk to the Mess Hall.  Reddie Decl. ¶ 11.  Although the Second Circuit in Williams v. Does reinstated the plaintiff's free exercise claim alleging that his religious rights were substantially burdened where he was given premature meals during Ramadan, causing him to break his fast, the undersigned finds that, assuming plaintiff was served his Saviour's Day meal prior to sunset, this one occurrence does not constitute a violation of his First Amendment rights.  Compare Williams, 639 F.

App'x at 56-57 ("Williams's complaint alleged that the [five] premature sunset meals forced him to either forego his meal or break his fast; he characterized fasting for Ramadan as important to his practice of Islam and stated that eating before sunset was a 'grave spiritual sin' that canceled the 'validity' of fasting. Consequently, Williams successfully alleged a plausible free exercise claim.") with Jean-Laurent, 2015 WL 1015383, at *6 (concluding that "missing two of the Ramadan meals also does not constitute a violation of Plaintiff's First Amendment right to the free exercise of his religion.").

Thus, to the extent that plaintiff suggests Father Reddie's involvement in these claims, the undersigned recommends that defendants' motion for summary judgment on this ground be granted.

## C. Fourteenth Amendment Equal Protection

In the May 11, 2017 Decision and Order, this Court found that plaintiff's Fourteenth Amendment equal protection claims survived initial review. Dkt. No. 5 at 10-11. Plaintiff contends that Supt. Martuscello and DSP Barringer (1) discriminated against him by failing to provide Jumu'ah services; and (2) violated his equal protection rights by denying him showers prior to Jumu'ah services. See Compl. at 8, 10.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. U.S. CONST. amend. XIV, § 1. Essential to that protection is the guarantee that similarly-situated persons be treated equally. See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "To prove a violation of the Equal Protection Clause . . . a

plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005).

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).

If an individual cannot "allege membership in [a protected] class, he or she can still prevail in . . . a class of one equal protection claim." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotation marks and citations omitted).  To succeed, a plaintiff must show "that [he] [was] intentionally treated differently from other similarly-situated individuals without any rational basis."  Clubside, Inc. v. Valentin, 468 F.3d 144, 158-59 (2d Cir. 2006). Additionally, plaintiffs must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves . . . ." Neilson, 409 F.3d at 104. "Generally, whether parties are similarly situated is a fact-intensive inquiry" best suited for the jury unless "no reasonable juror could find that the persons to whom plaintiff compares itself are similarly situated," and then summary judgment is appropriate.  Id. (citations omitted).


### 1. Jumu'ah Services

Plaintiff contends that his Supt. Martuscello and DSP Barringer discriminated against

28

him by failing to provide the NOI community with Jumu'ah services. See Compl. at 10-11; Pl. Opp. ¶¶ 25, 26. "Establishment of an equal protection violation requires the plaintiff show purposeful discrimination directed at an identifiable suspect class." Ramsey v. Goord, 661 F. Supp. 2d 370, 397 (W.D.N.Y. 2009) (internal quotation marks and citation omitted). To demonstrate an equal protection claim based on religion, plaintiff must establish that "he was treated differently from similarly situated members of other religions." Jackson v. Mann, 196 F.3d 316, 321 (2d Cir. 1999)

Defendants argue that plaintiff fails to proffer admissible evidence demonstrating that Supt. Martuscello and DSP Barringer intentionally discriminated against him because of his religion. See Def. Mem. of Law at 16-17. The undersigned agrees. Plaintiff first wrote a letter to Superintendent Martuscello in November 2015 requesting Jumu'ah services. Dkt. No. 33-2 at 338-39; Martuscello Decl. ¶ 14. On November 21, 2015, Supt. Martuscello drafted a memorandum responding to plaintiff's request. Martuscello Decl. ¶ 15, Ex. B at 26. In that memorandum, Supt. Martuscello informed plaintiff that the Ministerial Services Religious Calendar did not make an accommodation for, or otherwise reference, a daytime Jumu'ah service for the NOI religious community. Id. Supt. Martuscello urged plaintiff to "make the best use of [his] existing [daytime] program," and wished the NOI community "all the best" in their Tuesday evening classes. Id. Prior to receiving the response from Supt. Martuscello, plaintiff filed a grievance (CX-18704-15) regarding the lack of daytime Jumu'ah services. Dkt. No. 33-5 at 36. Plaintiff requested that Coxsackie offer daytime services "like Sunni and Christian[s] get at this prison." Id. In conjunction with this grievance, Supt. Martuscello

29

requested that DSP Barringer contact the DOCCS Central Office to request daytime religious services for the NOI community. Martuscello Decl. ¶ 21; Barringer Decl. ¶ 6.  DSP Barringer contacted the Central Office, and an accommodation was made for the 2016 Ministerial Calendar that allowed NOI congregate services to be held on Friday mornings effective January 8, 2016. See id.  The Coxsackie IGRC responded to plaintiff's grievance on December 23, 2015, and informed him that the "Central Office [ ] approved N.O.I. for congregate services on Friday mornings in the facility Chapel Annex, starting 1/8/16." Martuscello Decl. ¶ 22, Ex. C. at 35.  At his deposition, plaintiff admitted that "less than two months" after he requested Jumu'ah services, they were scheduled on the 2016 Ministerial Services calendar.  Dkt. No. 33-2 at 338-39.

Although plaintiff argues that Catholics, Protestants, and Sunni Muslims had weekly religious services, Pl. Opp. ¶¶ 24, 25, 27, the undersigned finds that there is no indication in the record that Supt. Martuscello or DSP Barringer were motivated by a discriminatory animus.  See Bussey v. Phillips, 419 F. Supp. 2d 569, 581 (S.D.N.Y. 2006) ("A plaintiff can plead intentional discrimination on the basis of race in several ways, including by identifying a law or policy that expressly classifies persons on the basis of race, a facially neutral law or policy that has been applied in an intentionally discriminatory manner, or a facially neutral statute or policy that has an adverse effect and is motivated by discriminatory animus."). Instead, the record is clear that within two months of plaintiff's November 2015 request, Coxsackie instituted Friday morning Jumu'ah services for the NOI community. See supra. As plaintiff cannot demonstrate intentional or purposeful discrimination, it is recommended that

defendants' motion on this ground be granted.

### 2. Showers Prior to Services

A similar conclusion applies to plaintiff's contention that Supt. Martuscello and DSP Barringer violated his equal protection rights by denying him showers before Jumu'ah services. See Compl. at 8. Plaintiff relies primarily on a March 9, 2012 memorandum drafted by non-party former Coxsackie DSS Miller, which stated that "prior to the Nation of Islam (N.O.I.) services, all inmates attending such service will be allowed to shower." Id. at 8; Dkt. No. 1-1 at 9. Supt. Martuscello and DSP Barringer both declared that this memorandum was rescinded prior to January 8, 2016, and that the Central Office Ministerial Services supported Coxsackie's decision to rescind. Martuscello Decl. ¶ 37, Ex. E at 53; Barringer Decl. ¶ 10. As of January 8, 2016, "no inmates of any religious groups were allowed to shower as a matter of right immediately prior to any religious service." Martuscello ¶ 38; Barringer ¶ 10. Thus, plaintiff has failed to demonstrate that he, a member of the NOI community, was treated differently than members of other religious communities. See Phillips, 408 F.3d at 129. Although plaintiff argues that "[t]he Sunni Muslim religious group still to this day are allowed to shower prior to their service," he fails to proffer evidence substantiating his contention. Pl. Opp. ¶ 26. Plaintiff's conclusory allegation fails to create a genuine issue of material fact sufficient to defeat a summary judgment motion. See Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment[.]") (quoting Fletcher v. Atex, Inc., 68

F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks omitted)).

Nor has plaintiff demonstrated that Supt. Martuscello and DSP Barringer were motivated by a discriminatory intent. See Bussey, 419 F. Supp. 2d at 581. There is no indication in the record that either defendant permitted one religious group to shower before religious services and not another. As stated, both Supt. Martuscello and DSP Barringer declared that in January 2016, no member of any religious group was permitted to shower prior to religious services. Martuscello ¶ 38; Barringer ¶ 10. As plaintiff cannot demonstrate intentional or purposeful discrimination, or that the he was treated differently than members of another religious group, it is recommended that defendants' motion on this ground be granted.

### 3. Plaintiff's Remaining Contentions

To the extent that plaintiff suggests that Supt. Martuscello and DSP Barringer violated his Fourteenth Amendment rights by (1) cancelling the December 15, 2015 NOI class; (2) granting insufficient time for religious services; or (3) prematurely ordering the NOI members to eat dinner prior to sundown during the February 26, 2016 Saviour's Day event, plaintiff fails to demonstrate either defendant's personal involvement or that they otherwise acted with discriminatory intent. See Bussey, 419 F. Supp. 2d at 581.

First, both Supt. Martuscello and DSP Barringer declared that they were not present in the facility on December 15, 2015, and plaintiff has failed to proffer evidence demonstrating otherwise. See Martuscello Decl. ¶ 26; Barringer Decl. ¶ 7. In responding to plaintiff's appeal

of grievance CX-18764-15 regarding the cancellation of the class, Supt. Martuscello accepted plaintiff's grievance in part, and concluded that NOI classes could be conducted by inmate facilitators if a staff facilitator was present.  Martuscello Decl. ¶ 32, Ex. D at 44.

Second, with regard to insufficient time for religious services, Supt. Martuscello found that plaintiff's grievance "contain[ed] some merit," and "correct[ed] th[e] issue" by ordering the NOI community be allowed to leave for services at 8:15 a.m. to "allow for all adherents of the NOI faith to be present in the Chapel Annex for the full allotment of time appropriated to them by the facility."  Id. at ¶ 48, Ex. F. at 64.  Moreover, DSP Barringer declared that he "did not make the determination regarding what time to make the announcement and let NOI adherents out of their cells in January 2016."  Barringer Decl. ¶ 12.

Finally, as to the February 26, 2016 Saviour's Day event, neither Supt. Martuscello nor DSP Barringer were present in the facility, and they declared that they did not take part in deciding when inmates ate their meals that day.  Martuscello ¶ 51; Barringer ¶ 13.  Although Supt. Martuscello issued a decision regarding plaintiff's grievance (CX-18862-16) alleging that the NOI community was forced to break their fast early, there is no indication that Supt. Martuscello had any direct involvement in the decisions surrounding the end of the event and when the community broke their fast.  See Martuscello Decl. ¶ 53, Ex. G. at 77.  It is well-settled that "[d]enial of a grievance alone is insufficient to show personal involvement." Morales v. Fischer, 46 F. Supp. 3d 239, 255 (W.D.N.Y. 2014) (citing cases).      Thus, to the extent that plaintiff suggests Supt. Martuscello and DSP Barringer's involvement in these claims, the undersigned recommends that defendants' motion for summary judgment on this

ground be granted.

## D. Qualified Immunity

Defendants argue that, even if plaintiff's claims are substantiated, they are entitled to qualified immunity.  Def. Mem. of Law at 18-19.  Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).  A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test.  See subsection II.B.-C. supra, at 17-33.  Because there is no

constitutional violation, the undersigned does not reach the issue of whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F. Supp. 2d at 230. Accordingly, it is recommended that defendants' motion on this ground be granted.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 33) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[7]

      Dated: October 10, 2018
      Albany, New York

                                         Christian F. Hummel
                                         U.S. Magistrate Judge

---

[7] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).