UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANDRE CANTEY,

                    Plaintiff,

        -against-                                    9:17-CV-0284 (LEK/CFH)

DANIEL F. MARTUSCELLO, *et al.*,

                    Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Pro se Plaintiff Andre Cantey is a member of the Nation of Islam ("NOI") in the custody

of the New York Department of Corrections and Community Supervision ("DOCCS"). He and

other NOI adherents, like many other followers of Islam, have a religious obligation to

participate

> in the weekly congregate religious observance known as Jumu'ah. Participation in
> Jumu'ah is the central observance of Islam. It is commanded by the Qur'an (the
> principal book of the Muslim religion), see Qur'an 62:9-10, must be held on Friday
> afternoon and must be performed congregationally rather than individually. Jumu'ah
> has been compared in importance 'to the Saturday service of the Jewish faith and the
> Sunday service of the various Christian sects.'

Salahuddin v. Coughlin, 993 F.2d 306, 307 (2d Cir. 1993) (quoting O'Lone v. Estate of Shabazz,

482 U.S. 342, 360 (1987)); Dkt. No. 42-1 ("Quran") at 2–3; Dkt. No. 1 ("Complaint") ¶¶ 1–2.[1]

The NOI also observes a twice-yearly holy day called "Savior's Day," which commemorates the

_____

[1] Plaintiff's statements in the Complaint, as well as his Opposition (Dkt. No. 36), are
testimony cognizable on summary judgment, as they are sworn under penalty of perjury.
Compl. ¶ 17.

anniversary of the births of two of the sect's founders, Wallace Fard Muhammad and Elijah Muhammad. Dkt. No. 33-3 ("DOCCS Religious Calendar") at 48.

Plaintiff alleges that while he was incarcerated at Coxsackie Correctional Facility, Superintendent Daniel Martuscello, Chaplain Grover Reddie, and Deputy Superintendent of Programs David Barringer denied him the opportunity to participate in Jumu'ah, Savior's Day, and other religious exercises. Compl. at 5–13. The Court previously screened Plaintiff's Complaint under 18 U.S.C. § 1915 and found that it stated claims (1) against Reddie for violating Plainiff's rights under the Free Exercise Clause of the First Amendment; and (2) against Martuscello and Barringer for religious discrimination under the Equal Protection Clause of the Fourteenth Amendment. Dkt. No. 5 ("May 2017 Order") at 14. After the parties exchanged discovery, Defendants moved for summary judgment based on the doctrine of qualified immunity, Dkt. No. 33 ("Motion for Summary Judgment"), and Plaintiff opposed, Dkt. No. 36 ("Opposition"). The Honorable Andrew Christian F. Hummel, United States Magistrate Judge, issued a report-recommendation concluding that the Motion for Summary Judgment should be granted. Dkt. No. 39 ("Report-Recommendation"). Plaintiff objects. Dkt. 42 ("Objection").[2]

The Court agrees with the Magistrate Judge that a reasonable jury could not find Martuscello or Barringer liable for violating the Fourteenth Amendment. However, there is evidence to suggest that Reddie ignored Plaintiff's and other NOI adherents' requests to hold Friday Jumu'ah services for NOI inmates, that he postponed the NOI's Savior's Day religious event, and that a reasonable official in his position would have recognized those actions were

---

[2] On January 24, 2019, the Court issued a text order requesting further briefing from both parties on certain issues. Dkt. Nos. 43 ("January Text Order"), 51 ("Defendants' Supplemental Memorandum"), 53 ("Plaintiff's Supplemental Memorandum").

unconstitutional. Accordingly, the Court denies the Motion for Summary Judgment with respect to Plaintiff's free exercise claim against Reddie but grants the motion with respect to the claims against Martuscello and Barringer. It also orders Reddie to report whether he objects to the Court deeming the Complaint to assert a claim against him under RLUIPA. It reasons as follows.

## II.   LEGAL STANDARD

### A.  Reviewing a Report-Recommendation

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and it "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636. However, "where [the] parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision." Mario v. P & C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002); see also Thomas v. Arn, 474 U.S. 140, 150 (1985) (holding that Congress did not "intend[] to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings").

### B.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the

outcome of the suit under the governing law," and a dispute over a material fact is "genuine" if there is enough evidence to permit a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, summary judgment should be granted if and only if "no reasonable trier of fact could find in favor of the nonmoving party." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

Defendants bear the burden of identifying those portions of the record that demonstrate that Plaintiff (who bears the burden of proof at trial) has failed "to establish the existence of an element essential to [his] case." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To rebut Defendants' showing, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). He may not rest upon the mere allegations or denials of his pleading, but must set forth "specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. And he must support those facts with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

That said, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the plaintiff. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Its duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

### C.  Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To establish this defense at the summary judgment stage, the officers must show, based on undisputed facts, "*either* that [their] conduct did not violate 'clearly established rights' of which a reasonable person would have known, or that it was 'objectively reasonable' [for them] to believe that [their] acts did not violate these clearly established rights." Soares v. State of Conn., 8 F.3d 917, 920 (2d Cir. 1993).

The Court must look to both "the clarity of the law establishing the right allegedly violated' as well as 'whether a reasonable person, acting under the circumstances confronting a defendant, would have understood' that his actions were unlawful." Hanrahan v. Doling, 331 F.3d 93, 98 (2d Cir. 2003) (quoting Vega v. Miller, 273 F.3d 460, 466 (2d Cir. 2001)). The "contours" of the right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Golodner v. Berliner, 770 F.3d 196, 205 (2d Cir. 2014) (quoting Anderson v. Creighton, 483 U.S. 635, 639–40 (1987)). Thus, "once [the court] identif[ies] the right at issue," it must "look to whether the Supreme Court or [the Second Circuit] had articulated that right with adequate specificity at the time" of the alleged violation. Id. "[T]he right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." Reichle v. Howards, 566 U.S. 658, 665 (2012) (citations and quotation marks omitted). This standard

"do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." <u>Ashcroft v. Al-Kidd</u>, 563 U.S. 731, 741 (2011).

## III. FACTUAL BACKGROUND

The Report-Recommendation contains a more detailed summary of the evidence. R. & R. at 2–14. In short, the parties agree (or do not dispute) that the Coxsackie Religious Calendar did not list Jumu'ah as a scheduled service for NOI inmates, and that NOI inmates were not given the opportunity to participate in Jumu'ah services from at least June through December 2015. Dkt. No. 33-6 (Defendants' Statement of Facts") ¶¶ 51, 58, 62; Opp'n at 16, ¶¶ 51, 58, 62. Dkt. No. 33-4 ("Coxsackie Religious Calendar") at 17. This period included Ramadan, which lasted from June 18 through July 17, 2015. Defs' SOF ¶ 42. According to Plaintiff, Reddie and Barringer ignored requests, made in June 2015 by Plaintiff and other NOI inmates, to allow them to participate in such services. Compl. ¶ 2; Opp'n ¶ 10 (citing Hill Letter, filed in Dkt. No. 42-1 at 25–30). Both defendants deny they received any such request. Defs' SOF ¶ 44. The parties agree that Jumu'ah services were scheduled to be held on Friday mornings beginning on January 8, 2016. Defs' SOF ¶¶ 58, 60, 62; Opp'n at 16 ¶¶ 58, 60, 62.

The parties also agree that Savior's Day was on October 7, 2015, and that religious observances were scheduled for that day on the 2015 Coxsackie Special Events Calendar. Compl. ¶4; Defs' SOF ¶ 16. On October 6, 2015, however, Reddie informed the NOI community that the Savior's Day event needed to be rescheduled to make room for other events being held that day. <u>Id.</u> ¶¶ 17–19. Defendants assert that the event was postponed and held on October 24, 2015, <u>id.</u> ¶ 26, while Plaintiff alleges that it was cancelled entirely, Opp'n ¶ 24.

Plaintiff also asserts that when Coxsackie finally held Jumu'ah services for NOI inmates,

prison officials released them from their cells too late to complete religious services; denied them the right to shower before Jumu'ah; frequently cancelled the Islamic study classes normally held on Tuesdays for NOI inmates; and forced them to break their religiously-mandated fast before sunset on Savior's Day in February 2016. Comp. ¶¶ 12–18; Opp'n at 16–21, ¶¶ 65–110; R. & R. at 2–4. Defendants deny that these events violated the Constitution or, to the extent they admit that the late call-outs, shower-denials, cancellations, and premature fast-breaking occurred, deny that they were personally involved in them. R. & R. at 9–14; Defs' SOF ¶¶ 65–110.

## IV. DISCUSSION

A reasonable jury could find that denying Plaintiff the opportunity to participate in Jumu'ah services for five months and postponing Saviors Day services in October 2015 put a "substantial burden" on Plaintiff's religious exercise, and that prison officials had no legitimate reason for doing so. The Court concludes that such conduct would have violated Plaintiff's clearly established rights under the Free Exercise Clause. Second, a reasonable jury could find that Reddie intentionally participated in those denials despite having information that would have alerted a reasonable officer he was violating those rights.

However, a rational jury could not find Reddie liable based on the cancellations of Islamic study classes, denying Plaintiff showers before Jumu'ah services, or cutting short his participation in Jumu'ah services or his February 16 Savior's Day fast. Nor could it find that Martuscello or Barringer violated Plaintiff's rights.

The Court will address each point in turn.

**A. Denial of Jumu'ah and October 2015 Savior's Day Services**

As the Magistrate Judge explained, "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." O'Lone, 482 U.S. at 348 (citations omitted). That directive subjects government actions to heightened scrutiny when they place "substantial burdens" on practices motivated by beliefs that are "sincerely held, and in the individual's own scheme of things, religious." Ford v. McGinnis, 352 F.3d 582, 588, 592 (2d Cir. 2003). "[A] substantial burden exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996) (quoting Thomas v. Review Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 718 (1981)).[3] Government regulation "exceeds the substantial burden threshold" when it "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a prisoner's individual beliefs" or "den[ies] a prisoner reasonable

---

[3] The Second Circuit Court of Appeals has not decided whether a burden on religious practices must be "substantial" in order to violate the First Amendment. Williams v. Does, 639 F. App'x 55, 56 (2d Cir. 2016) (citing Holland v. Goord, 758 F.3d 215, 220 (2d Cir. 2014)). It is also unclear whether the "substantial burden" test, to the extent that it lives, "includes an inquiry into the centrality or importance of a burdened practice to the plaintiff's system of religious belief." Salahuddin, 467 F.3d at 275 n.5. At times, the Second Circuit has stated that when "determining whether a prisoner's religious beliefs have been substantially burdened, the relevant question is whether the infringed-upon religious activity is considered central or important to the prisoner's practice of his religion." Williams, 639 F. App'x at 57; see also Newdow v. Peterson, 753 F.3d 105, 109 (2d Cir. 2014) (applying the "substantial burden" test to hold that inscription "In God We Trust" on U.S. currency did not compel atheists to choose between "a basic benefit and a core belief"). On other occasions, however, it has warned district courts not to "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004); accord Korte v. Sebelius, 735 F.3d 654, 683 (7th Cir. 2013) (opining that the "substantial burden" test "evaluates the coercive effect of the governmental pressure on the adherent's religious practice and steers well clear of deciding religious questions"). The Court need not resolve these issues— both because the parties have not raised them and because Reddie's conduct imposed a substantial burden on Plaintiff's religious exercise under either analysis.

opportunities to engage in those activities that are fundamental to a prisoner's religion."

Muhammad v. N.Y. Dep't of Corr., 904 F. Supp. 161, 188 (S.D.N.Y. 1995).

> However,

> [b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion . . . are the interests of prison officials charged with complex duties arising from administration of the penal system. Free exercise claims of prisoners are therefore 'judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'

Ford, 352 F.3d at 588 (quoting O'Lone, 482 U.S. at 349) (some quotation marks and citations omitted). Prison officials may interfere with inmates' exercise of their religion if their actions are "reasonably related to legitimate penological interests" such as "deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone, 482 U.S. at 348 (citing Turner v. Safely, 482 U.S. 78, 89 (1987)).[4]

The Second Circuit applies the same balancing test to generally-applicable policies and case-specific decisions. Ford, 352 F.3d at 595 n. 15. "First, there must be a valid and rational connection between the regulation and the legitimate government interest justifying it." Id. at 595. Next, the Court must consider

> whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de

---

[4] The Second Circuit has not decided "what effect the Supreme Court's decision in Emp. Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 879 (1990) [holding that the Free Exercise Clause does not mandate religious exemptions from neutral laws of general applicability], has on the O'Lone standards for judging prisoner free-exercise claims." Salahuddin, 467 F.3d at 274 n.3 (citing Levitan v. Ashcroft, 281 F.3d 1313, 1318–19 (D.C. Cir. 2002) (exploring the possible implications of Smith)); see also Holland, 758 F.3d at 222 (instructing district court to apply the Turner/O'Lone reasonableness test to a generally applicable regulation). Neither party asks the Court to do so in this case.

minimis adverse effect on valid penological interests.

Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir. 2006).

To defeat summary judgment on a free exercise claim, the prisoner has the initial burden to show that "the disputed conduct substantially burdens his sincerely held religious beliefs." Id. (citing Ford, 352 F.3d at 591) (assuming without deciding that the burden must be "substantial"). Second, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Id. Then, the "prisoner [must] 'show that these [articulated] concerns were irrational.'" Id. (citing Fromer v. Scully, 874 F.2d 69, 74 (2d Cir. 1989)).

Defendants do not question that Plaintiff's religious beliefs are sincerely held. Accordingly, to determine if Plaintiff's clearly established rights free exercise were violated, the Court must decide only whether the denials of religious services placed substantial and unjustified burdens on the exercise of those beliefs, and if so, whether reasonable officers in Defendants' positions would have known it.

### 1. "Substantial Burden"

#### i. Jumu'ah

Evidence of which a reasonable chaplain would have known suggests that denying Plaintiff access to Jumu'ah services placed a substantial burden on his religious exercise.

Twenty-six years ago, the Second Circuit deemed it "well established that prisoners have a constitutional right to participate in congregate religious services." Salahuddin, 993 F.2d at 308. "[M]issing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion." Jones v. Malin, No. 15-CV-5381, 2017 WL 985943, at

*3 (S.D.N.Y. Mar. 13, 2017). But "[d]enying an inmate congregate religious services over a prolonged period [does] substantially burden[]" that right." Id. In Young v. Coughlin, the Second Circuit held that preventing a prisoner from attending Jumu'ah services, religious classes, and Ramadan activities for two months without a legitimate reason was sufficient to support a free exercise claim passed summary judgment. 866 F.2d at 570. And in Ford, the Second Circuit held that a prison chaplain (an Imam) who refused a prisoner's request to attend just one holiday service—the Eid ul Fitr feast at end of Ramadan—imposed substantial burden without any legitimate justification and, therefore, violated the inmate's clearly established rights. 352 F.3d at 594, 597; see also Salahuddin, 467 F.3d at 277 (holding that where "the facts, viewed in the light most favorable to [the plaintiff-prisoner], show[ed] a violation of his free-exercise rights by exclusion from [Muslim] religious services and denial of in-cell religious meals for no permissible reason" for around two months, defendant-official could not have "reasonably perceived" such the infringement to be constitutional).[5]

As in Young, Ford, and Salahuddin, there is ample evidence (of which Reddie should have known) that attending Jumu'ah services on Fridays, particularly during Ramadan, was for Plaintiff critical to observing his religion. In a letter addressed to defendants Barringer and

---

[5] These cases did not contradict O'Lone, decided in 1987. There—where the Supreme Court upheld a prison regulation restricting prisoners assigned to outdoor work details from reentering the prison to attend Jumu'ah—the Court assumed that the regulation imposed a substantial burden on their religious exercise, but found based on prison officials' testimony that legitimate security concerns justified the regulation. O'Lone, 482 U.S. at 350–51. It considered the prisoners' ability "to participate in other religious observances of their faith" only to "support[] the conclusion that the restrictions at issue . . . were reasonable." Id. As explained later, unlike in O'Lone, Defendants have not offered any legitimate penological reason for denying Plaintiff's requests for Jumu'ah services.

Reddie, as well as Deputy Commission of Programs Jeff McCoy, Anthony Hill (the NOI inmate facilitator at Coxsackie) stated that:

> The NOI community w[ould] like to observe a religious worship service and congregational prayer of Ju'mah Friday as the whole Islamic world is observing. The whole entire Islamic world of orthodox Muslims and NOI Muslims are practicing their Islamic worship through their belief and guidance of the Holy Quran. Ju'mah Friday is a ritual tradition and practice by "ALL" Muslims worldwide. Congregational prayer on Fridays is a very important part of the spiritual growth and development of the NOI.

Dkt. No. 42-1 ("Hill Letter") at 27.[6] Hill also explained that he had already expressed these concerns to Reddie. Id. at 25; see also Quran 2–3 (stating under the heading "Surat Al-Jumu'ah" that "[w]hen the call is proclaimed for the Salat (prayer) on Friday (Jumu'ah prayer), come to the remembrance of Allah . . . and leave off business (and every other thing))."

DOCCS literature confirmed these descriptions. The DOCCS 2015 Religious Holy Day Calendar noted that "Nation of Islam offenders observe Friday as a day of worship" and that "Nation of Islam holy days," including Ramadan, "are celebrated in a like manner to the rest of the Muslim community." DOCCS Religious Calendar at 48; see also id. at 32 (stating that during "Friday Jumu'ah service . . . Muslims are required to offer their prayers upon the early entry of the time of prayer"). A 2013 calendar prepared by defendant Reddie listed Jumu'ah services on Friday afternoons for "Muslim[s]," though events specific to the Nation of Islam were listed

---

[6] Plaintiff referred to Hill's letter to his Opposition, Opp'n at 3, and attached it to his Objection as part of Exhibit C, and the Court directed Defendants to address the letter in their Supplemental Memoranda. Though Defendants assert that Reddie never received the letter itself, they have raised no other objections to the Court considering Hill's statements within it for the purposes of summary judgment. See Defs' Supp. Mem. at 4–9. Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible at trial."). The Court has done so. However, at trial, to prove the truth of any of the assertions in the letter, Plaintiff would need to offer admissible evidence of it—for example, the testimony of Hill as a witness.

under a separate heading. Coxsackie Religious Calendar at 17. Sure enough, Plaintiff testified that he "has been to two other state facilities in DOCCS and both facilities—Wyoming and Downstate—provide religious Jumu'ah Services on Friday afternoon for the NOI faith." Opp'n at 13, ¶ 41.

Drawing all inferences from this evidence in Plaintiff's favor, a reasonable officer in Reddie's position would have known that missing Jumu'ah services from June 23, 2015, when Plaintiff wrote defendant Reddie, until January 2016 would impose a substantial burden on his religious exercise.

### ii. Savior's Day

The Magistrate Judge found it beyond genuine dispute that the decision to cancel the October 7, 2015 Savior's Day service (or reschedule it for October 24, 2015) did not place a substantial burden on Plaintiff's religious exercise. The Court respectfully disagrees.

As discussed earlier, government action "substantially burdens" a prisoner's religious exercise when it prevents him from doing something that it "central or important to the prisoner's practice of his religion." Williams, 639 F. App'x at 57. The Magistrate Judge correctly observed that "courts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religious exercise." R. & R. at 24. However, the cases cited in the Report-Recommendation addressed only weekly worship services. Id. at 23–24.

In contrast, the DOCCS religious calendar lists "Savior's Day" on October 7, 2015 as a "holy day" of special significance in the NOI faith: the "anniversary of the birth of the Most Honorable Elijah Muhammad." DOCCS Religious Calendar at 48. DOCCS policy "afford[s]

offenders the opportunity to have an in-house program during the day." Id. The event is recognized as significant enough that it may only be rescheduled to occur after Savior's Day with prior approval from the Director of Ministerial, Family, and Volunteer Services, which Defendants concede was not obtained in this case. Defs' SOF ¶¶ 33 (citing DOCSS Directive 4202 § VII(A)), 40. Plaintiff testified that Savior's Day is indeed a "holy day" that NOI adherents cannot "make up" by observing on another day, and that the two NOI inmate facilitators agreed with him. Opp'n at 11, ¶¶ 20, 27.

As indicated earlier, the Second Circuit has held that denying an inmate the opportunity to attend one service that is "central or important" to his religion, such as a holy day observance, without a legitimate reason violates his clearly established First Amendment rights. Ford, 352 F.3d at 594, 597. In Ford, the Muslim chaplain denied the plaintiff the opportunity to participate in the Eid ul Fitr feast at the end of Ramadan because the plaintiff was confined in the Special Housing Unit ("SHU"), "a more restrictive confinement reserved for prisoners who present disciplinary or other problems." Id. at 585. The Court denied summary judgment and stated that if it had been undisputed that the plaintiff had not received the feast on Eid ul Fitr, it "would [have been] inclined to hold . . . that [he] ha[d] established a substantial burden as a matter of law." Id. Relying on the plaintiff's testimony and the "DOCCS religious calendar [which] recognize[d] the Eid ul Fitr as one of the [Muslim] faith's important celebrations and ma[de] specific reference to the feast." Id. at 594. Therefore, Eid ul Fitr was "sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a de minimis burden." Id. n.12; accord Shakur v. Selsky, 391 F.3d 106, 120 (2d

14

Cir. 2004) (holding that denying a Muslim prisoner from participating in religious feast placed a "substantial burden" on his religious exercise).

Defendants point out that other NOI inmates agreed to have the Saviour's Day event rescheduled. Reddie Decl. ¶ 4. However, the fact that other NOI members felt comfortable postponing Savior's Day observance does not answer the "relevant question:" whether holding the event on Savior's Day was "central or important to Ford's practice of Islam." Ford, 352 F.3d at 594. In Ford, the defendants argued that they were entitled to qualified immunity because they reasonably relied on Imams' advice that the holy day observance was unimportant, and that the officials could prevent a Muslim from attending without substantially burdening his beliefs. Id. at 597–98. The court of appeals rejected that argument. Id. at 598. "Despite the fact that all the religious authorities testified to their belief that the [event] was without religious significance, the proper inquiry was always whether Ford's belief was sincerely held and 'in his own scheme of things, religious.'" Id. at 598. Therefore, "[t]he religious authorities' opinions that a particular practice [was] not religiously mandated under Muslim law, without more, [did not] render [the] defendants' conduct reasonable." Id. Likewise, given the importance Plaintiff and DOCCS policy attributed to holding Savior's Day services on Savior's Day, a reasonable official in Reddie's shoes would not necessarily have believed that the "practice [was] so peripheral to the plaintiff's religion" that postponing the event could "be aptly characterized as [a] constitutionally de minimis" burden. Id. at 593.[7]

---

[7] The fact the Ford and Shakur addressed a different holy day (Eid ul Fitr, rather than Savior's Day), does not change the analysis. See Ford, 352 F.3d at 597 (explaining that "courts need not have ruled in favor of a prisoner under precisely the same factual circumstance in order for the right to be clearly established").

## 2. *Legitimate Penological Interests*

Defendants have not presented any evidence that they had a legitimate penological reason not to hold weekly Jumu'ah services from June through December 2015 or to postpone the October 2015 Savior's day event. They do assert that "there was a lack of space at the facility for all of the events scheduled at Coxsackie C.F. on October 7, 2015 due to a large number of events which were scheduled for that date." Defs' SOF ¶ 18. But nothing in the record identifies these "events" or explains why holding them instead of Savior's Day services (which had been on the DOCCS religious calendar for a year) served to deter crime, rehabilitate prisoners, protect institutional security, or meet any other penological goal. O'Lone, 482 U.S. at 348.

"The Second Circuit has held that qualified immunity is not appropriate at the summary judgment stage where genuine issues of material fact exist as to whether defendants had legitimate penological justifications for denying plaintiffs certain opportunities for religious exercise." Pugh v. Goord, 571 F. Supp. 2d 477, 512 (S.D.N.Y. 2008); see Orafin v. Rashid, 249 F. App'x 217, 218 (2d Cir. Sept. 28, 2007) (reversing grant of summary judgment and denying qualified immunity based on "unresolved issues of material fact relevant to the questions of (1) the burden that the denial of a Friday congregate prayer service placed on plaintiffs' religious exercise; and (2) whether the DOC is able to accommodate plaintiffs' request for a Shiite-led Friday congregate prayer service without jeopardizing legitimate penological objectives."); Salahuddin, 467 F.3d at 275–77 (reversing grant of summary judgment and denying qualified immunity because prison officials did not meet their "burden . . . to 'point[] to [something] in the record suggesting" that the officials denied religious services because of the legitimate interest of preventing threats to inmate safety); Young, 866 F.2d at 570 (holding that the district court

should have denied summary judgment because prison officials did not "proffer an explanation as to why [the inmate] was denied access to religious services, or articulate a particular penological interest that was served by denying appellant such access"). Therefore, Reddie is not entitled to summary judgment based on qualified immunity.

### 3. Reddie's Personal Involvement

It is not enough, however, to show that Plaintiff's clearly established rights were violated. Under § 1983, a "plaintiff must [also] show . . . the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Reddie argued, and the Magistrate Judge concluded, that he was not personally involved in denying Jumu'ah services or postponing Savior's Day. In the Court's view, however, a reasonable jury could reach the opposite conclusion and find that a reasonable officer in Reddie's position would have known that his acts and omissions would violate Plaintiff's right to exercise his religion.

"Government officials may be held liable under § 1983 for a failure to do what is required as well as for overt activity which is unlawful and harmful." Doe v. N.Y.C. Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir. 1981). "When an official is charged with default in exercise of the above affirmative responsibility, there are two fundamental requisites for § 1983 liability to be imposed:" (1) "the omissions must have been a substantial factor leading to the denial" of constitutional rights; and (2) the officials "must have displayed a mental state of at least "deliberate indifference" in order to "meaningfully be termed culpable" under § 1983. Id. In other words, "[t]o find a defendant liable in a § 1983 action, the defendant must be the proximate cause of the constitutional violation alleged," Burton v. Lynch, 664 F. Supp. 2d 349, 361 n.17 (2009),

and must have the mental state required to violate the Constitutional provision at issue, Turkman v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015), rev'd on other grounds, Ziglar v. Abbasi, 137 S. Ct. 1843 (2017).

The Second Circuit's decisions have made it clear that a state official "prohibit[s]" religious exercise under the First Amendment if he intends to place a burden on the plaintiff's religious exercise. The Second Circuit has repeatedly found triable claims against prison officials (in at least one case, a chaplain) who knowingly refused to allow Muslim prisoners to participate in religious services without any discriminatory motive. See Salahuddin, 467 F.3d at 275 (denying access to holiday services and religious meals); Ford, 352 F.3d at 585, 594 (denying request to attend Eid ul Fitr); Young, 866 F.2d at 570 (denying access to Jumu'ah services); see also McEachin, 357 F.3d at 119, 202–04 (noting that "courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith" violates the constitution "even when the infringement results from the imposition of legitimate disciplinary measures"); By taking an action, or refusing to act, knowing that it would burden prisoners' religious exercise rights, the defendants in these cases can be said to have intended that result in the traditional tort-law sense. See W. Page Keeton et al., Prosser & Keeton on Torts § 8 ("Prosser") (defining "intent" as "the purpose to bring about state physical consequences" or the "substantial certainty" those consequences will flow from one's actions and distinguishing it from "motive," or the "reasons for desiring certain consequences"); accord Restatement (Second) of Torts § 8A (1965) ("Second Restatement"); see also Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 920 (2017) (explaining that "[t]raditional tort principles," along with "the values and

principles of the constitutional right at issue," help define "the contours and prerequisites of a § 1983 claim.").

"To be 'intentional,' an invasion of another's interest . . . need not be inspired by malice or ill will on the actor's part toward the other. An invasion so inspired is intentional, but so is an invasion that the actor knowingly causes in the pursuit of a laudable enterprise without any desire to cause harm." Second Restatement § 825. As the court implicitly held in <u>Ford</u> (where the chaplain simply denied the plaintiff's request to attend services), omissions may also be intentional. <u>See id.</u> ("It is the knowledge that the actor has at the time he acts or fails to act that determines whether the invasion resulting from his conduct is intentional or unintentional."). After all, an inmate is locked in a cell many hours of the day; inmates must rely on "call-outs"—scheduled times for release—to attend religious services. Defs' SOF ¶ 101. As with medical care, "if the prison authorities fail to [act]," the inmate's religious "needs will not be met." <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976).

In <u>Lovelace v. Lee</u>, the Fourth Circuit reached the same conclusion. 472 F.3d 174, 201 (4th Cir. 2006) . It reasoned that "the operative word 'prohibit' in the First Amendment," like the word "deprive" in the Fourteenth, "connotes a 'conscious act' rather than a merely negligent one." <u>Id.</u> (citing <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986)).[8] There, the plaintiff-prisoner

---

[8]  In <u>Daniels</u>, the Supreme Court held that the word "deprive" in the Due Process Clause of the Fourteenth Amendment implies a "*deliberate* decision." 474 U.S. 327, 331 (1986). Later, it clarified that it is the official's "state of mind with respect to . . . [the] physical consequences" of his actions, but not with respect to the "interpretation" of those actions—that must be "deliberate"—that is, to "deprive" an inmate of due process, a prison guard must apply force "purposefully or knowingly," but need not intend that the force be "excessive" or harmful. <u>Kingsley v. Hendrickson</u>, 135 S.Ct. 2466, 2472 (2015). Applying the framework in <u>Kingsley</u> to the First Amendment would mean that an official who purposefully or knowingly imposes a burden on religion need not know the burden is objectively "substantial." However, that is a matter to be addressed, if necessary, when crafting jury instructions.

claimed that he was denied the right to fast or participate in religious services during Ramadan. Id. The court vacated the district court's grant of summary judgment because there was a genuine issue of material fact concerning whether the defendants "acted intentionally in depriving [the plaintiff] of his free exercise rights." Id. at 202. Thus, the Court did not require a more culpable state of mind, like discriminatory animus. Id.; cf. Kingsley v. Hendrickson, 135 S.Ct. 2466, 2472 (2015) (holding that "force purposefully or knowingly used" against a pretrial detainee violates the Fourteenth Amendments long as it is "objectively unreasonable," even if the officer did intend that the force be excessive).[9]

Defendants, however, reject the standard applied in Salahuddin, Ford, Young, and Lovelace. They argue that it is not enough that officials act (or fail to act) intentionally; they must also have a discriminatory motive. For support, they point to the Supreme Court's statement in Ashcroft v. Iqbal that "[w]here the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." 556 U.S. 662, 676–77 (2009) (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 54 –41 (1993)). The Court in Iqbal cited Equal Protection cases explaining that "purposeful discrimination requires more than intent as . . . awareness of the consequences"—"[i]t instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." Id. However, as this passage and the cited cases indicate, the Court in Iqbal

---

⁹ Reckless actions or omissions might also qualify as "deliberate" conduct that "prohibit[s]" the free exercise of religion—just as they constitute deliberate conduct that "deprives" a pretrial detainee of due process, Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017), or "inflicts" cruel and unusual punishment, Farmer v. Brennan, 511 U.S. 825, 836 (1994). The Court need not decide the issue for the purposes of this motion.

referred to the standard for alleging a claim of "invidious discrimination" and did not purport to change the standard applicable to all free exercise claims.

In particular, the plaintiff in Iqbal sued high executive officials for a broad Department of Justice policy of "religious discrimination:" targeting Muslim men for restrictive confinement "solely on account of [their] religion, race, and/or national origin." Id. at 669. He did not assert that the law placed a "substantial burden" on any religious practice. Such a claim may well have been futile; by 2009, Supreme Court precedent had established that (with limited exceptions) "generally applicable" policies may constitutionally burden religion unless they are shown to have a discriminatory purpose or single out religious conduct for disfavored treatment. See Seabrook v. City of New York, 210 F.3d 355 (2d Cir. 2000) ("It is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the 'incidental effect' of an otherwise valid neutral provision.") (citing Emp. Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 879 (1990)).

Here, in contrast, Plaintiff does not challenge any "generally applicable rule;" rather, he challenges case-specific decisions that undisputedly applied *only* to NOI adherents and interfered with their rights to engage in identified religious practices. DOCCS regulations gave prison officials discretion to allow inmates to attend congregate services on request, DOCCS Directive 4202 §§ III(A)(2), VI, and Coxsackie officials permitted members of other religions to attend congregate religious services, including Jumu'ah. Dkt. No. 33-4 at 17. Plaintiff challenges Reddie's decision to withhold an accommodation available to inmates of other religions. Such an action, which "singles out" a certain religion "in a selective manner," does not apply a "generally

applicable" rule; therefore, <u>Smith</u> does not shield it from constitutional scrutiny. <u>Lukumi</u>, 508 U.S. at 543, 537 (explaining that "in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason"). For that reason, "close scrutiny of laws singling out a religious practice for special burdens is not limited to the context where such laws stem from animus" or "religious hostility." <u>Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene</u>, 763 F.3d 183, 197 (2d Cir. 2014). Accordingly, cases like <u>Ford</u>, <u>Salahuddin</u>, and <u>McEachin</u>—"where generally applicable prison policies were designed to accommodate inmates' religious . . . requirements, but the same allowances were not made for inmates subjected to disciplinary restrictions," 357 F.3d at 204—are still good law. And they still teach that unjustified, selective burdens on religious exercise violate the Free Exercise Clause regardless of the actor's motives. <u>Id</u>.[10]

### i. Jumu'ah

A reasonable jury could find that Reddie intentionally ignored Plaintiff's and other NOI members' requests to hold Jumu'ah services for the NOI community.

---

[10] Other courts have reached the same conclusion after <u>Iqbal</u>. <u>See</u> <u>Thompson v. Holm</u>, 809 F.3d 376, 381 (7th Cir. 2016) (holding that "a prisoner has a clearly established right to a diet consistent with his religious scruples including proper food during Ramadan" and that "because the evidence supports an inference that the defendants intentionally and unjustifiably forced this burdensome choice on [the plaintiff], qualified immunity is unavailable") (citing <u>Ford</u>, 352 F.3d at 597); <u>Refaat El Badrawi v. United States</u>, No. 07-CV-1074, 2011 WL 13086946, at *4 (D. Conn. May 16, 2011) (rejecting argument that <u>Iqbal</u> requires intentional discrimination to violate the free exercise clause). Indeed, in a case alleging that a jail chaplain denied an individual inmate's request for a kosher diet, the Tenth Circuit denied qualified immunity and noted that it could not locate a "single authority" holding "that a conscious or intentional interference with [an inmate's] right to free exercise . . . is consistent with the First Amendment." <u>Ralston v. Cannon</u>, 884 F.3d 1060, 1067 (10th Cir. 2018).

Reddie asserts that he did not know about the Jumu'ah issue until November 2015, when Plaintiff filed his grievance, and fixed it soon after. R. & R. at 21. But substantial evidence supports Plaintiff's opposing position: that Reddie knew about Plaintiff's sincere belief that Islam mandated his participation in Jumu'ah services, and Plaintiff's requests for such services, as early as June 2015. Plaintiff states in his sworn Complaint that on June 23, 2015, he wrote Reddie a letter requesting Friday Jumu'ah services. Compl. ¶ 2; Dkt. No. 33-2 at 125 ("June 23, 2015 Letter"). In his deposition, Plaintiff testified that he put his name on the letter, stamped it, addressed it to Reddie, and placed it in the Coxsackie internal mail system. Dkt. No. 33-2 at 226. In Grullon, the Second Circuit held such facts—"indicating that [a] [l]etter was sent to [a prison warden] at an appropriate address and by appropriate means"—permitted "the reasonable inference . . . that the Warden in fact received the letter, read it, and thereby became aware of the conditions of which [the prisoner] complained." 720 F.3d at 141. The Court explained:

> It is of course possible that the Warden read the Letter and took appropriate action or that an administrative procedure was in place by which the Warden himself would not have received the [l]etter addressed to him; but those are potential factual issues as to personal involvement that likely cannot be resolved without development of a factual record.

720 F.3d at 141.

Grullon was decided at the pleading stage. However, its reasoning applies here, on summary judgment, because Plaintiff testified that he properly addressed and sent the letter in the prison mail system, and Reddie has not developed a "factual record" establishing Plaintiff's letter never reached him. "There is a rebuttable [evidentiary] presumption that a letter which is mailed is received by the addressee," and [p]roof of mailing may be established . . . offering testimony of the person who actually mailed the letter." Mount Vernon Fire Ins. Co. v. E. Side Renaissance

Assocs., 893 F. Supp. 242, 245 (S.D.N.Y. 1995); accord Hagner v. United States, 52 S. Ct. 417, 419 (1932) ("The rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed."). "[T]he fact that receipt of the letter subjects the person sending it to a penalty does not alter the rule." Hagner, 285 U.S. at 430. Reddie's general "denial of receipt, standing alone, is insufficient to rebut the presumption." Mount Vernon, 893 F. Supp. at 246. Accordingly, the jury could reasonably infer that Reddie received and read Plaintiff's letter in June and disbelieve Reddie's testimony to the contrary.

Plaintiff's letter, however, is not the only evidence suggesting that Reddie knew NOI inmates needed to attend Jumu'ah services. Hill's letter indicates that NOI prisoners complained to Reddie about Jumu'ah services as early as June 2015. The letter states that members of the NOI had already gone "to the current Coordinating Chaplain of Religious Affairs, Father Reddie," with their concerns, including the lack of Jumu'ah services on Fridays. Hill Letter at 25, 27. Although the letter is undated, McCoy received and responded to it by June 19, 2015, indicating that Hill sent his letter properly before that date. Dkt. No. 42-1 ("McCoy Letter") at 31. Plaintiff's November letter to Superintendent Martuscello corroborates that, contrary to Reddie's testimony, NOI members raised the Jumu'ah issue with him before November 2015 as Defendants contend. Dkt. No. 33-5 ("Martuscello Declaration") at 5–6, ¶ 19 (quoting November letter stating that "several members [of the NOI] explain[ed] this [Jumu'ah] issue to Chaplain Ready [sic] and he failed to accommodate the NOI with daytime services").

Finally, McCoy's response to Hill's letter states that Coxsackie staff "was contacted regarding [Hill's] allegation and concerns." Id. It states that "staff ha[d] informed [his office] that

. . . the Coordinating Chaplain [was] working with the NOI adherents to address religious needs" and stated that "all additional concerns should be addressed to the Coordinating Chaplain." Id. Defendants admit the "Coordinating Chaplain" was Reddie. Supp. Mem. at 8. This lends additional support to Hill's statements that by mid-June 2015, NOI members had already raised the concerns in his letter, including the Jumu'ah issue, with Reddie—and it supports the conclusion that the ball was in Reddie's court. The jury could therefore conclude that Reddie was substantially certain that if he did not arrange for NOI Jumu'ah services, they would not be held for the remainder of Ramadan and beyond.

Indeed, there is substantial evidence that Reddie was at least partially responsible for accommodating Plaintiff's religious need for congregate Jumu'ah services. As Coordinating Chaplain for Coxsackie, Reddie was "assigned the responsibility for coordination of the total facility religious program and related administrative tasks" and "for meeting the needs of inmates who ascribe to emerging religious faiths." DOCCS Directive 4200 § III(A)(2). In addition, as the McCoy Letter indicated, because Reddie was the "covering staff advisor" for the NOI, NOI members could "address religious inquiries and concerns" to him. Dkt. No. 33-4 ("Reddie Declaration") at 2, ¶2; see also Dkt. No. 33-3 ("Barringer Declaration") at 1, ¶ 2 (stating that staff advisors were responsible for "oversee[ing]" their assigned faith); Defs' SOF ¶ 5, 8 (stating that staff advisors oversaw religious programs for particular faiths and "the NOI community could address religious inquiries and concerns to Reddie"). Therefore, the evidence is sufficient for a jury to find that Reddie was responsible for acting on NOI members' requests to attend Jumu'ah services—by relaying the request to the superintendent, if necessary.[11]

---

[11]   The Court's own review of the record and applicable regulations indicates that it is possible that Reddie would have had to request the Superintendent's permission to accommodate

## ii. Savior's Day

There is also a genuine dispute of material fact concerning whether Reddie was personally involved in rescheduling the Savior's Day event.

In addition to his responsibilities listed earlier, as the staff advisor for the NOI, Reddie was "responsible for setting up each event" for holy days listed in the DOCCS religious calendar, which included the Savior's Day program. Dkt. No. 33-3 at 64. In addition, DOCCS regulations charged him, as Coordinating Chaplain, to "coordinate the various religious functions and the use of designated religious space" and to consult with the Superintendent to "resolve any conflicts pertaining to the scheduling and conduct of worship services." DOCCS Directive 4202 §§ V, VI(B)(5). The Central Office Review Committee, in response to Plaintiff's grievance concerning the Savior's Day postponement, advised Plaintiff and the other grievants to "address further concerns" regarding Holy Day observances "to the Coordinating Chaplain," Reddie, "for the most expeditious means of resolution." Defs' SOF ¶ 40. Consistent with those descriptions of his responsibilities, it was Reddie who "recognized that there would be clashes because of a total lack of space for all events which were scheduled" on October 7, 2015, conferred with Barringer, and asked for the NOI community's consent to reschedule the event. Defs' SOF ¶ 31. And Plaintiff testified in his deposition that it was Reddie who told him and the other NOI members that the Savior's Day event was cancelled. Dkt. No. 33-2 at 234.[12] Based on these facts, the jury

_____

the NOI's request to attend Jumu'ah services on Fridays. See DOCCS Directive 4202§ VI(B)(2)–(3) (indicating that the superintendent will decide "requests . . . to observe their congregational worship services"). However, Defendants do not argue that this is significant to the personal involvement analysis.

[12] That said, Plaintiff points to no evidence that Reddie failed to submit the paperwork necessary to schedule the event. In his objection, Plaintiff states that Reddie's response to

could reasonably conclude that Reddie intentionally and substantially influenced the decision to postpone the Savior's Day services and, therefore, violate Plaintiff's clearly established rights.

### B. Remaining Claims Against Reddie

Plaintiff also alleges that Reddie: (1) cancelled several NOI Islamic study classes, with the last cancellation occurring on December 15, 2015, Dkt. No. 33-2 at 282; (2) denied Plaintiff religiously-mandated showers before Jumu'ah services, including on January 8, 2016; (3) routinely called Plaintiff out of his cell too late to partake in full religious services; and (4) ordered Plaintiff to break has religious fast too early (before sunset) on Savior's Day, February 26, 2016. Compl. ¶¶ 11–12, 13–16, 17.[13] The Magistrate Judge concluded that Plaintiff failed to present evidence demonstrating Reddie's personal involvement in any of these decisions. R. & R at 26.

The Court agrees. Plaintiff's objections do not explain how Reddie knew of or participated in the decisions to deny NOI inmates showers before Jumu'ah, issue late call-outs, or force them to break their fast on Savior's Day 2016. Obj. at 6–8. In particular, as to Savior's Day 2016, Reddie testified via affidavit that he instructed the inmates to prepare to leave the chapel for the mess hall at 5:00 p.m., that they left at 5:32 p.m., that the meal was not served until 5:38 p.m., and that sunset was at 5:40 p.m. Dkt. No. 33-4 ¶ 11. Plaintiff contends that Reddie and

_____

Plaintiff Interrogatory 23 admitted that he failed to do so. However, that Interrogatory asked: "Defendant Reddie, is it true that you never submitted an event packet to the Deputy Superintendent of Programs requesting the NOI community be allowed to celebrate Savior's day and the Holy day of Atonement in a timely manner?" Dkt. No. 33-2 at 398. Reddie responded, "No," indicating that he did submit the required paperwork. Id. at 593–94.

[13]  The Nation of Islam has two Savior's Days per year—on the anniversaries of the births of Wallace Fard Muhammad (February 26) and Elijah Muhammad (October 7). Dkt. No. 33-3 at 48.

another officer ordered the inmates to eat earlier. Dkt. No. 33-2 at 327. However, Plaintiff agrees that sunset was at 5:40 p.m., id., and he could not recall what time Reddie ordered the inmates to proceed from the chapel to the mess hall, id. at 330–33. His belief that the inmates ate before sunset is based on hearsay; he heard the NOI inmate facilitator tell Reddie as much. Id. at 330–33. Plaintiff does not present any evidence concerning how the facilitator knew the time or whether the sun had set. In any event, Plaintiff concedes that it was a Sergeant Donovan, not Reddie, who gave the order to eat. Id. at 325; Opp'n at 12 ¶ 105. Accordingly, Plaintiff has not provided enough evidence for a jury to conclude the inmates broke their fast prematurely or, if they did, that Reddie was responsible.

The Court also agrees that Reddie was uninvolved in the cancellation of Islamic study classes. As Plaintiff points out in his objection, Hill's May or June 2015 letter to Barringer and Reddie supports the conclusion that Reddie and Barringer knew that Islamic study classes were frequently cancelled because of some non-party prison officials' misunderstanding that the classes could not be held when Reddie was absent. Hill's letter "ask[ed] . . . why [NOI] classes [were] continuously cancelled," more than "any other religious organization at Coxsackie," and noted that NOI inmates had "tried . . . to speak to our current Chaplain, Father Reddie, about our concern." Dkt. No. 42-1 at 29. Hill wrote that Reddie told NOI inmates that "the reason . . . NOI classes [were] cancelled [was] because he [was] not present at the facility at the time of [the] classes"—even though "per Directive, as long as an inmate facilitator is present, classes of chosen faith must be open for registered members to exercise their religious right." Id. Prison administration (specifically, the Central Office Review Committee) later confirmed that prison regulations allowed classes to be held with an inmate facilitator, rather than Reddie. Defs' SOF ¶

77. A reasonable jury could therefore conclude that Reddie knew that given his other responsibilities, he might be unavailable to host a future study class and, therefore, a misguided official might cancel the class again. Indeed, on December 15, 2015, a correctional officer again cancelled the weekly class because Reddie was not present to host it. Defs' SOF ¶ 66. However, at most, this proves that Reddie was negligent (ignored an unreasonable risk that the classes would be cancelled), not that he intended the resulting cancellation(s). Such conduct "amounting to nothing more than negligence is not actionable under the First Amendment." Riehl v. Martin, No. 13-CV-439, 2014 WL 1289601, at *10 (N.D.N.Y. Mar. 31, 2014) (citing Lovelace, 472 F.3d at 201); accord Ralston, 884 F.3d at 1067 nn. 3, 8.

In addition, a reasonable official in Reddie's position would not have thought that cancelling Islamic studies classes on several occasions placed a "substantial" burden on Plaintiff's religious exercise. Plaintiff has not submitted any testimony indicating that he considers the classes "central or important to the . . . practice of his religion," Williams, 639 F. App'x at 57, or that cancelling them put "substantial pressure on [him] to modify his behavior and to violate his beliefs," Jolly, 76 F.3d at 477. As explained earlier, missing only a few weekly religious gatherings over a six-month period has consistently been held an insubstantial burden the exercise of a prisoner's religion. See Hanton v. Mathiau, 29 F. App'x 772, 773 (2d Cir. 2002) (affirming summary judgment on free exercise claim because "being unable to attend religious services on two days during a three month period" did not constitute a "substantial burden" on religion); see also Smith v. Graziano, No. 08-CV-469, 2010 WL 1330019, at *9 (N.D.N.Y. Mar. 16, 2010), adopted, 2010 WL 1332503 (Apr. 6, 2010) (same). At the very least, controlling precedent has not "placed the . . . question beyond debate." Al-Kidd, 563 U.S. at 741. If Reddie

intended (or perhaps if he acted recklessly regarding) the cancellations, the jury could consider them along with the lack of Jumu'ah services to assess whether it would have been unreasonable for Reddie to think that the overall interference with Plaintiff's religious exercise was "substantial." Salahuddin, 467 F.3d at 273. Nevertheless, the evidence does not suggest that Reddie knew that more classes would be cancelled. Thus, the jury could not conclude that the cancellations were part of any burden Reddie personally placed, or caused to be placed, on Plaintiff's religious exercise.

### C. Equal Protection Claims Against Martuscello and Barringer

Plaintiff's final objection is to the Magistrate Judge's recommendation to dismiss his Fourteenth Amendment Equal Protection claims against Barringer and Maruscello. Unlike the Free Exercise Clause of the First Amendment, the Equal Protection Clause requires a plaintiff, "in order to survive a motion for summary judgment," to "come forward with at least some credible evidence that the actions of the individual [defendants] were motivated by [religious] animus or ill-will." Grillo v. New York City Transit Auth., 291 F.3d 231, 234 (2d Cir. 2002). The Court agrees with the Magistrate Judge that Plaintiff has failed to do so. There is no evidence that Martuscello knew Plaintiff's religion mandated attendance at Jumu'ah services until Plaintiff's November 2015 grievance educated them. Dkt. No. 33-5 ("Martuscello Declaration") at 4–5. Though Martuscello initially indicated that he would deny Plaintiff's request to attend those services, he promptly asked Barringer to request permission fromm the DOCCS Central Office to hold Jumu'ah services for NOI inmates on Friday mornings, and the Central Office approved the services to begin on January 8, 2019. Id. at 6, 26, 55; see also Barringer Decl. at 3.

The jury might reasonably determine that since McCoy received Hill's letter, the other addressees, including Reddie and Barringer, probably received it too. However, even if Barringer received Hill's letter in June 2015, his responsibility for religious programs at Coxsackie was supervisory; unlike Reddie, he was not responsible for addressing inmates' requests in the first instance. Defs' SOF ¶ 5; Opp'n at 9, ¶ 5. "It is well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged." Rodriguez v. Rock, No. 13-CV-01106, 2015 WL 5147045, at *6 (N.D.N.Y. Sept. 1, 2015) (dismissing similar religious claim against a deputy superintendent of programs to whom plaintiff sent complaint letter, while upholding claims against line officers who ignored plaintiff's complaints). Supervisory officials are entitled to expect prisoners to take complaints through the "proper channels" and do not proximately cause violations of prisoners' rights by forwarding complaints to the officials with primary responsibility to address the issue. Id.; Mateo v. Fischer, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (explaining that supervisory officials "receive large numbers of letters from inmates" and they "delegate subordinates to handle them;" reasoning that if courts found supervisors liable "every time a supervisor forwarded a complaint to a subordinate, the [personal involvement] requirement would lose all meaning"). The record shows that Barringer deferred to McCoy to respond to Hill's letter, and McCoy directed Hill to address his unresolved religious concerns to Reddie. McCoy Letter at 31. Plaintiff points to no evidence that Barringer had a duty to address the Jumu'ah requests or that he refused to do so because of discriminatory animus instead of the justified assumption that Reddie would handle the issue.

Thus, a rational jury could not infer that Martuscello or Barringer intentionally deprived Plaintiff of Jumu'ah services based on "religious animus or ill will." Grillo, 291 F.3d at 234.

Plaintiff also offered no evidence—and has not explained how he has personal knowledge—to support his claim that the defendants allowed Sunni Muslims, but not NOI adherents, to shower before services, R. & R. at 31, and nothing to support a finding that Martuscello or Barringer were involved in the other alleged equal protection violations, R. & R. at 32–33.

Accordingly, Plaintiff's equal protection claims must be dismissed.

**D. RLUIPA**

Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") "protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." Salahuddin, 467 F.3d at 273 (quoting 42 U.S.C. § 2000cc–1(a)). "RLUIPA creates a private right of action for violations of § 3." Id. (citing § 2000cc–2(a)). "Section 3 applies if 'the substantial burden [on religious exercise] is imposed in a program or activity that receives Federal financial assistance.'" Id. (quoting § 2000cc–1(b)(1)). "In the prison context, this section sweeps broadly, as '[e]very State . . . accepts federal funding for its prisons.'" Id. (quoting Cutter v. Wilkinson, 544 U.S. 709, 716 n. 4 (2005)). In Salahuddin, "because the unchallenged and unresolved factual allegations as viewed in the light most favorable to [the plaintiff] establish[ed] that [his] free-exercise rights were substantially burdened by" two restrictions on religious services that were "not justified by a legitimate penological interest," the court held that "a fortiori" it could

not grant summary judgment under the stricter standards of RLUIPA. <u>Salahuddin</u>, 467 F.3d at 275–78. Here, because the evidence also creates genuine dispute of fact concerning whether Reddie violated the Free Exercise Cause, the same is true concerning Plaintiff's rights under RLUIPA.

However, the Court appears to have overlooked RLUIPA in its May 2017 Order identifying Plaintiff's claims, even though it was required to "liberally construe his pleadings" and "interpret his complaint to raise the strongest arguments it suggests." <u>Abbas v. Dixon</u>, 480 F.3d 636, 639 (2d Cir. 2007); <u>see also</u> <u>Young v. Goord</u>, 67 F. App'x 638, 640 (2d Cir. 2003) (reversing dismissal of pro se complaint alleging only free exercise claim because the plaintiff "may [have been] able to state a claim under RLUIPA"). As a result, the parties did not address RLUIPA in their summary judgment papers. The Court will therefore give Reddie fourteen days to lodge any objection to the Court's deeming the Complaint to include a RLUIPA claim.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 39) is **ADOPTED** to the extent that it dismisses the claims against Martuscello and Barringer and **MODIFIED** in that the claim against Reddie survives summary judgment; and it is further

**ORDERED**, that the Motion for Summary Judgment (Dkt. No. 33) is **GRANTED** in part and **DENIED** in part as set forth above; and it is further

**ORDERED**, that Reddie shall, within **fourteen days** of the filing date of this Memorandum-Decision and Order, state whether he objects to the Court's deeming the Complaint to include a claim under RLUIPA. If he objects, Reddie shall state whether the

addition of a RLUIPA claim based on the facts alleged in the Complaint would prejudice him under the standard of <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962), or any other applicable rule. He shall also specify what further discovery, if any, he would require if such a claim were added.

   **IT IS SO ORDERED.**


DATED:     March 28, 2019
           Albany, New York




                                    Lawrence E. Kahn
                                    U.S. District Judge